Richard A. Ramler
Ramler Law Office, P.C.
202 West Madison
Belgrade, MT   59714
Telephone (406) 388-0150
Telefax (406) 388-6842
RichardRamler@aol.com

Jordan L. Chaikin
Parker Waichman LLP
3301 Bonita Beach Road, Suite 101
Bonita Springs, Florida 34134
Telephone (239) 390-1000
Telefax (239) 390-0055
jchaikin@yourlawyer.com

Attorney for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

---

| | |
|---|---|
| SHARON J. BARRERE and L. BRICE BARRERE, | ) Cause No. _____ |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) **COMPLAINT AND** |
| REMINGTON ARMS COMPANY, L.L.C., | ) **DEMAND FOR JURY** |
| SPORTING GOODS PROPERTIES, INC., | ) **TRIAL** |
| and E. I. DuPONT DE NEMOURS AND | ) |
| COMPANY, | ) |
| | ) |
| Defendants. | ) |

---

COMES NOW the Plaintiffs, Sharon J. Barrere and L. Brice Barrere, by and through their attorneys, and for their claim for relief against Defendants, Remington Arms Company, L.L.C., Sporting Goods Properties, Inc., and E.I. DuPont de Nemours and Company, state and allege as follows:

**PARTIES**

1.      Plaintiffs, Sharon J. Barrere (hereinafter "Sharon") and L. Brice Barrere (hereinafter "Brice"), are husband and wife, and are residents of Carter County, State of Montana.

2.      Defendant Remington Arms Company, L.L.C., (hereinafter "Remington") is a Delaware Corporation and is not authorized to do business in the State of Montana.

3.      Defendant Sporting Goods Properties, Inc. (hereinafter "SGPI") is a Delaware Corporation and is not authorized to do business in the State of Montana.

4.      Defendant E. I. DuPont de Nemours, Inc. (hereinafter "DuPont") is a Delaware Corporation and is authorized to do business in the State of Montana. DuPont's registered agent is C T Corporation System which is located at 208 North Broadway Suite 313, Billings, Yellowstone County, Montana.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over this matter pursuant to 28

U.S.C. § 1332 in that the Plaintiffs are citizens of the State of Montana, and that the Defendants are all corporate citizens of the State of Delaware, and the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars.

6.     Venue is proper within the Billings Division because Defendant E.I. DuPont de Nemours and Company is a corporation incorporated in a state other than Montana, and it's registered agent is located in Yellowstone County, Montana; the tort that is the subject of this civil action was committed in Carter County, Montana; and Plaintiffs are residents of Carter County, Montana.

## COMMON ALLEGATIONS

7.     Plaintiffs reside in Carter County, Montana, and are citizens of the State of Montana.

8.     Defendants, Remington, DuPont and SGPI were, and are now, engaged in the business of designing, manufacturing, assembling, distributing and selling firearms, and in this regard did design, manufacture, distribute, sell and place into the stream of commerce, the Remington Model 600 Mohawk .308 caliber bolt action rifle including the action, fire control system, and safety, bearing Serial Number 6416259 (hereinafter "Rifle"), knowing and expecting that said Rifle would be used by consumers and around members of the general public.

9.     Prior to December 1, 1993, DuPont owned 100% of the stock in the company known as Remington Arms Company, Inc. (now SGPI).  On or about

December 1, 1993, RACI (Remington Arms Acquisition Corporation, Inc.)
purchased from DuPont substantially all of the income producing assets of
Remington Arms Company, Inc. (now known as SGPI), including the corporate
name.  The company formerly known as Remington Arms Company, Inc. changed
its name to Sporting Goods Properties, Inc., and RACI changed its name to
Remington Arms Company, Inc.  SGPI retained certain non-income producing
assets, some with significant environmental and other liabilities, such that its net
worth was reduced to a small fraction of its former worth so that SGPI will not be
able to pay reasonable judgments in this and similar litigation.

10.     At all times pertinent to this action, Defendants SGPI and DuPont
were and are the alter ego of each other and in essence constitute one legal entity
within which SGPI operates as a division of DuPont.  The separate incorporation
of SGPI is a sham in that it is merely a corporate veil which attempts to insulate
DuPont from liability for products manufactured and sold by SGPI.  DuPont
exerted and currently exerts extreme influence, complete dominion and/or absolute
control over the corporate activity and function of SGPI.  DuPont's continued
operation of SGPI as a separate legal entity is a subterfuge designed to defeat
public convenience, justify a wrong, perpetrate a fraud and/or otherwise work an
injustice on Plaintiffs herein and the general public.  The conduct of DuPont and/or
SGPI has harmed or will harm Plaintiffs and the general public, justifying piercing

of the corporate veil resulting in DuPont being liable for the acts and omissions of SGPI as they are in reality one legal entity.

11.     All Defendants are so intertwined contractually for the liabilities, past, present and future, of each other that they are, in fact, one entity and therefore, the corporate veils of each company should be pierced to properly ascertain the responsible parties for the allegations contained herein.  The Asset Sale/Purchase Agreement transferring the assets of SGPI to Remington and various revised or supplemental agreements spread responsibility and authority for product liability claims among the three Defendants as it is unclear who bears the contractual liability for this claim.   Remington, DuPont and SGPI jointly defend product liability claims involving Remington rifles under the terms of a Joint Defense Coordination Agreement.

12.     Remington and/or DuPont expressly and impliedly agreed to assume certain debts and responsibilities, including the product liability of SGPI by the terms of the Asset/Sale Purchase Agreement and subsequent agreements, as well as, the continuing relationship between Remington, DuPont and SGPI. Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

13.     Remington continues in the design, manufacture, distribution and sale of all Remington Arms product lines including Remington bolt action rifles. Remington maintains the same plants, employees, organization, contracts, customers, suppliers, advertising, products and name acquired in the asset purchase.  Remington acquired the entire company from SGPI through an asset/sale purchase in order to attempt to avoid and/or limit the liability resulting from an outright purchase of the stock from DuPont.  Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

14.     Remington, DuPont and SGPI acted fraudulently with respect to the asset/sale purchase in that its purpose was to avoid and/or limit the responsibility of DuPont and/or Remington for the debts of SGPI, particularly its product liability.  Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

15.     At all times pertinent to this action, SGPI was an agent of DuPont acting in the course and scope of its agency relationship, thereby making its principal, DuPont, liable for all SGPI's acts and omissions, either by exercising direct control over SGPI, or by adopting and ratifying SGPI's acts or omissions.

16.     At all times pertinent to this action, agents of DuPont acting within

the course and scope of their agency relationship, controlled SGPI, thereby making SGPI's acts and omissions those of their principal, DuPont, either by exercising direct control over SGPI, or by adopting and ratifying SGPI's acts or omissions.

17.    Defendants manufactured, marketed, and distributed the Rifle, including the action, fire control system, and safety.  The Rifle contains the "Walker" fire control system.

18.    The Rifle, with the Walker fire control system, is unreasonably dangerous and defective in that it may, and in this instance did, fire without a trigger pull or trigger activation upon release of the safety, movement of the bolt, or when jarred or bumped.

19.    The Rifle was purchased by Herman Loving sometime before October 31, 2007.  The Rifle was manufactured and sold by Defendants sometime before December 1, 1993.

20.    Plaintiffs were unaware of the defective nature and unreasonably dangerous propensity of the Rifle to fire without a trigger pull.

21.    On October 31, 2007, Brice, Sharon, Sybel Loving and Herman Loving, were hunting deer on Brice and Sharon's ranch in Carter County, Montana.  Sybel Loving was hunting with the Remington Model 600 Mohawk Rifle.

22.     Sybel Loving was unloading the Rifle by cycling the bolt after the hunt when it suddenly and unintentionally discharged.  The bullet struck Sharon in the left foot.

23.     Sharon was immediately taken to the emergency room at Dahl Memorial Healthcare in Ekalaka, Montana.  The wound was too severe to treat at Dahl Memorial Healthcare and Sharon was transferred to the Billings Hospital, Billings, Montana for treatment.

24.     Sharon was hospitalized in Billings and underwent extensive medical treatment.  Sharon's left great toe was amputated on November 5, 2007.

25.     Plaintiffs presumed that trigger activation occurred while Sybel Loving was attempting to unload the Rifle because they understood that firearms are designed to fire when the trigger is activated.

26.     Plaintiffs had no reason to suspect the firearm was defective or to make further investigation into this matter.

27.     Sometime after October 2010, Herman Loving told Brice about the CNBC television program entitled "Remington Under Fire."

28.     The CNBC  program "Remington Under Fire" documented design defects with Remington bolt action rifles.  Specifically that Remington bolt action rifles often discharge without a trigger pull.  The program provided Plaintiffs with

new information which allowed them to re-evaluate the accident and how it occurred.

29.     With this information, Plaintiffs were able to consider the Rifle's defect as the cause of the accident for the first time.

30.     Prior to being told about this program, Plaintiffs had no actual knowledge of Remington bolt action rifle's design defect, nor of its unique design component, the trigger connector, and could not have discovered these defects by using reasonable diligence.

31.     Defendants' fraudulent concealment of material information concerning design, manufacturing, and other defects in Remington bolt action rifles prevented Plaintiffs from discovering their claims against Defendants.

32.     Defendants' internal records show that Defendants have received thousands of customer complaints that Remington rifles containing the Walker fire control have fired without a trigger pull. The total number of complaints is unknown because Defendants' records also show that they have destroyed at least some of the records involving customer complaints. Between 1992 and 2004, Defendants have acknowledged receiving 3,273 customer complaints of Remington rifles with Walker fire controls firing without a trigger pull, which is an average of approximately 5 unintended firings per week for 13 years. This figure represents an average of those unintended firings which were documented reports

to Remington by customers.  Based upon information and belief, the actual number of unintended firings is much higher.

33.     According to Defendants, they have sold in excess of 5 million Remington bolt action rifles with the Walker fire control.  All of these bolt action rifles containing the Walker fire control are unreasonably dangerous because, although not all of them have fired without a trigger pull, it is foreseeable that any or all of them could fire without a trigger pull under various foreseeable circumstances.

34.     The Walker fire control was designed with an additional internal part called a "trigger connector."   The connector is "resiliently mounted", which means that it is not affixed or attached to the trigger body.  The connector is held in place only by the trigger return spring and the side plates of the enclosed housing.  The connector separates from the trigger body each and every time the rifle is fired, creating a gap between the two individual parts.  According to Defendants' internal documents, it is foreseeable to Defendants that contaminants can become trapped inside the enclosed housing, such as field debris, manufacturing scrap, burrs from the manufacturing process, lubrication that congealed that was applied at the factory, other lubrication build up, or moisture can interfere with the reliable function of the trigger connector.  Other factors that can restrict the proper retraction of the connector to secure and reliable sear support position include

various tolerance stack up conditions that have resulted in a binding of the trigger body, and/or the trigger connector on the side plates of the housing, binding of the connector on the trigger body, interferences between the connector and sear, and salt bleed out from powder metal parts.  Defendants' records show that without a secure and reliable sear and connector engagement, the rifles can inadvertently discharge without a trigger pull.

35.     The trigger connector feature used in the Walker fire control is unique in the world of firearms and has been exclusively used by Remington.  No other modern firearm manufacturer has adopted this two (2) piece trigger construction.

36.     Defendants have known that the Walker fire control can fire without a trigger pull since at least 1947 according to Remington's internal documents.  The occurrence of safety related malfunctions have been so persistent and common that Defendants have created internal acronyms to use when discussing the various ways the rifles may fire without a trigger pull.  Remington's records show that the most common malfunction is what Remington has termed a "FSR," which refers to a fire on safety release.

37.     Defendants' records show that other acronyms created by Defendants to describe unintended firings (without a trigger pull) are "FOS", which refers to firing off safe; "JO," or "jar off", which refers to firing if the gun is jarred or bumped; "FBO", which refers to firing on bolt opening; "FBC", which refers to

firing on bolt closing: and "fails to fire", which refers a failure of the rifle to fire when the trigger is intentionally pulled but the rifle then fires when the bolt or some other part of the rifle is touched.

38.     Defendants have deceived Plaintiffs and the public by claiming they have no knowledge of the dangerous and defective conditions involving the use of Walker fire control.    Specifically, Defendants have repeatedly falsely claimed that Remington bolt action rifles cannot fire without a trigger pull unless the Walker fire control has been improperly adjusted or the rifle has been improperly maintained.  Defendants have also falsely claimed that no one has ever been able to replicate the unintended firing of a Remington bolt action rifle without a trigger pull unless the Walker fire control has been improperly modified or improperly maintained.

39.     Defendants' internal documents, including memos, committee meeting minutes, testing records, research and development records, design change requests, process record change authorization forms, customer complaint memo's, gallery test failure reports, and gun examination reports, clearly show that the Walker fire control is dangerous and defective because it allows Remington bolt-action rifles, including the Model 600 rifles, to fire without a trigger pull under various foreseeable circumstances.

40.      During Remington bolt action rifle litigation, Defendants have routinely required broad protective orders before producing internal documents in discovery.   Defendants routinely demand that all of their records be filed under seal with the court.  Defendants insist that settlements be covered by confidentiality agreements or protective orders.

41.      Employee testimony and internal memoranda show that Defendants have destroyed test results and other evidence concerning the Walker fire control.

42.      Defendants have wrongfully withheld production of damaging internal documents in past litigation.

43.      Defendants recalled the Model 600 riles because of the defective Walker fire control system originally installed in the rifles.  Herman Loving returned the Rifle to Defendants in response to the recall.  Defendants replaced the original fire control system with a defective Walker fire control system and returned the Rifle to Herman Loving.

44.      Defendants falsely and fraudulently represented to owners of Model 600 rifles, including Herman Loving, and the public that Defendants had fixed the Model 600 rifles that had been returned under the recall program when in fact, Defendants  replaced the original fire control systems in the rifles with defective Walker fire control systems.

45.     Defendants' false and fraudulent statements and actions taken to hide damaging internal documents from the public, including Plaintiffs, and Defendants' false and fraudulent actions taken during the recall program were designed by Defendants to prevent inquiry and escape investigation into defects in Remington rifles.  Defendants' false and fraudulent statements and actions taken to hide damaging internal documents from the public and Defendants' false and fraudulent actions taken during the recall program were and are designed to mislead the public, including Plaintiffs, and to hinder the acquisition of information concerning defects in Remington rifles.  Defendants' fraudulent statements and wrongful actions prevented Plaintiffs from discovering the cause of their injuries and damage.

46.     As a result of the discharge of the Rifle without a trigger pull, Plaintiffs sustained physical and emotional injuries, medical expense, lost income, loss of established course of life, loss of consortium,  and other general and special damages in an amount to be determined by the jury at trial.

## COUNT ONE
## Strict Liability-Design Defect

47.     Plaintiffs hereby incorporate by reference all above allegations as if fully set forth herein.

48.      The Rifle was purchased in a defective condition unreasonably dangerous in violation of § 27-1-719  M.C.A.

49.  At all relevant times, Defendants were engaged in the business of designing, manufacturing, assembling, distributing, and selling firearms, and in this regard, did design, manufacture, distribute, sell, and place into the stream of commerce the Rifle, knowing and expecting that the Rifle would be used by consumers including Sybel Loving and members of the general public.

50.  The Rifle was expected to and did reach Herman and Sybel Loving without substantial change in the condition in which it was sold.  Herman Loving returned the Rifle to Defendants to have the fire control system replaced under Defendants' recall program.  The Rifle's fire control system was not modified or adjusted after it was replaced by Defendants under Defendants' recall program. The Rifle was not improperly maintained.

51.  In any event, it is reasonably foreseeable to Defendants that the Walker fire control may be improperly adjusted or improperly maintained by users or consumers of Remington rifles, including the Rifle.  Improper adjustment and improper maintenance is not unreasonable misuse of the product.

52.  Defendants are strictly liable to Plaintiffs for Plaintiffs' general and special damages resulting from Defendants' manufacture and sale of the Rifle that was in a defective condition unreasonably dangerous in violation of § 27-1-719 M.C.A.

53.  Specifically, Defendants' design was defective and unreasonably

dangerous in one or more of the following respects:

    a.    In designing a fire control with a "trigger connector;"

    b.    In designing a fire control with manufacturing tolerance build up.

    c.    In designing a fire control that failed to include preset engagement between the rigger connector and the sear;

    d.    In designing a fire control that was susceptible to the accumulation of debris, lubrication build up, moisture, freezing, and/or the accumulation of rust;

    e.    In designing a fire control that was susceptible to adjustment;

    f.    In designing a fire control that was susceptible to the presence of manufacturing burrs or debris;

    g.    In designing a fire control that will fire without a pull of the trigger.

    h.    In designing a fire control that will fire when the safety is shifted from the "safe" to the "fire" position;

    I.    In designing a fire control that will fire when the bolt is cycled;

    j.    In designing a fire control that will "jar off";

    k.    In designing a fire control that uses improper materials, including "powdered metal" for the sear that are unusually susceptible to normal wear and tear;

    l.    In manufacturing a fire control that has burrs or manufacturing debris within the fire control;

    m.    In manufacturing a fire control without proper or adequate quality control procedures or checks;

54.    Plaintiffs had no knowledge of these defective and dangerous conditions and had no reason to suspect the Rifle was defective or unreasonably dangerous until sometime after Plaintiffs were told about the CNBC documentary "Remington Under Fire".

55.    As a result of the defective and unreasonably dangerous condition of the Rifle, Plaintiff Sharon Barrere sustained physical, emotional, and psychological injuries, past and future medical expense, past and future lost income, past and

future lost earnings capacity, loss of consortium, loss of established course of life, and other general and special damages in an amount to be determined at trial.

56.     Defendants knew or should have known about the defects alleged in this Complaint and that death and/or catastrophic injuries could occur and have occurred due to defects in the Rifle.  Nonetheless, the defects were not corrected by Defendants, nor did Defendants warn the public about these defects and the risks they posed.

57.     Instead, Defendants deliberately and intentionally concealed such information from Plaintiffs and the public.  Defendants acted with malice in that Defendants had knowledge of facts and intentionally disregarded facts that created a high probability of damage to Plaintiffs and deliberately proceeded to act in conscious and intentional disregard of the high probability of injury to Plaintiffs, and deliberately proceeded to act with indifference to the high probability of injury to Plaintiffs.

58.     Defendants further knowingly made false representations concerning the safety of the Remington bolt action rifles, and concealed material facts concerning the fact that the rifles could fire without a trigger pull causing injury to Plaintiffs.

59.     Plaintiffs are entitled to recover punitive damages from Defendants in an amount to be determined at trial.

## COUNT TWO
## Strict Liability-Failure to Warn

60.     Plaintiffs hereby incorporate by reference all of the above allegations as if fully set forth herein.

61.     At all relevant times, Defendants designed, manufactured and distributed the Rifle.

62.     Defendants knew, or in the exercise of ordinary care should have known, of the Rifle's propensity to unexpectedly discharge without pulling the trigger, yet Defendants failed to notify or warn Plaintiffs of this propensity, either before or after the purchase of the Rifle.

63.     Neither Plaintiffs nor the general public recognized the injury causing risks associated with the Rifle without such a warning.

64.     Defendants owed a duty to users including Plaintiffs to adequately warn of the defect and the injury causing risks associated with the Rifle prior to and after the sale of the product.  Failure to warn Plaintiffs of the risks associated with the Rifle was a breach of Defendants' duties to Plaintiffs to provide adequate warnings, both before and after the sale of the defective and unreasonably dangerous product.

65.     Defendants failed to warn users regarding the following defects:

   a.     In failing to warn users and handlers of the rifles of the potential for firings in the absence of a pull of the trigger;
   b.     In failing to warn users and handlers of the risks and hazards of

improper maintenance of the rifle;

c.    In failing to warn users and handlers of the risks and hazards of adjustment of the fire control;

d.    In failing to inform or advise users and handlers of the proper procedures for maintenance of the rifle; and

e.    In failing to inform or advise users and handlers of the proper procedures for adjustments to the fire control.

66.    As a result of Defendants failure to warn Plaintiffs about the defective and dangerous condition of the Rifle, and the injury causing risks associated with the Rifle, Plaintiff Sharon Barrere has sustained physical, emotional, and psychological injuries, past and future medical expense, past and future lost income, past and future lost earnings capacity, loss of consortium, loss of established course of life, and other general and special damages in an amount to be determined at trial.

67.    Defendants knew or should have known about the defects alleged in this Complaint and that death and/or catastrophic injuries could occur and have occurred due to their failure to warn. Nonetheless, the defects were not corrected by Defendants, nor did Defendants warn the public including Plaintiffs about these defects and the risks they posed.

68.    Instead, Defendants deliberately and intentionally concealed such information from Plaintiffs and the public. Defendants acted with malice in that Defendants had knowledge of facts and intentionally disregarded facts that created a high probability of damage to Plaintiffs and deliberately proceeded to act in

conscious and intentional disregard of the high probability of injury to Plaintiffs, and deliberately proceeded to act with indifference to the high probability of injury to Plaintiffs.

69.     Defendants further knowingly made false representations concerning the safety of the Rifle, and concealed material facts concerning the fact that the rifles could fire without a trigger pull causing injury to Plaintiffs.

70.      Plaintiffs are entitled to recover  punitive damages from Defendants in an amount to be determined at trial.

## COUNT THREE
### Negligence

71.     Plaintiffs hereby incorporate by reference all above allegations as if fully set forth herein.

72.      Defendants were negligent and failed to exercise reasonable care in the design, manufacture, marketing, and sale of the Rifle.  Defendants breached their duty to Plaintiffs by acting unreasonably in selecting the design of the Rifle, specifically the trigger mechanism, given the probability and seriousness of the risk posed by the design, the usefulness of the Rifle in such a condition, and the burden on Defendants to take necessary steps to eliminate the risk.

73.     Defendants were negligent in one or more of the following respects;

    a.     In designing a fire control with a "trigger connector;"
    b.     In designing a fire control with manufacturing tolerance build

up;

c.     In designing a fire control that failed to include preset engagement between the trigger connector and sear;

d.     In designing a fire control that was susceptible to the accumulation of debris, lubrication build up, moisture, freezing, and/or the accumulation of rust.

e.     In designing a fire control that was susceptible to adjustment;

f.     In designing a fire control that was susceptible to the presence of manufacturing burrs or debris;

g.     In designing a fire control that will fire without a pull of the trigger;

h.     In designing a fire control that will fire when the safety is shifted from the "safe" to the "fire" position;

i.     In designing a fire control that will fire when the bolt is cycled;

j.     In designing a fire control that will "jar off;"

k.     In designing a fire control that uses improper materials, including "powdered metal" for the sear, that are unusually susceptible to normal wear and tear;

l.     In manufacturing a fire control that has burrs or manufacturing debris within the fire control;

m.     In manufacturing a fire control without proper or adequate quality control procedures or checks;

n.     In failing to warn users and handlers of the rifles of the potential for firings in the absence of a pull of the rigger.

o.     In failing to warn users and handlers of the risks and hazards of improper maintenance of the rifle;

p.     In failing to warn users and handlers of the risks and hazards of adjustment of the fire control.

q.     In failing to inform or advise users and handlers of the proper procedures for maintenance of the rifle; and

r.     In failing to inform or advise users and handlers of the proper procedures for adjustments to the fire control.

74.     Defendants knew, or in the exercise of ordinary care should have known, that the Rifle was defective and unreasonably dangerous to those persons likely to use, or to be near those persons likely to use, the product for the purpose and manner it was intended to be used, and for foreseeable misuses of the Rifle.

75.     Defendants knew, or in the exercise of ordinary care should have known, of the means of equipping the Rifle with an adequate fire control system, thereby preventing injury to Plaintiff Sharon Barrere.  Defendants had actual knowledge of the means of designing or adding such a product, which would not fail in one or more of these ways.  Notwithstanding this knowledge, Defendants failed to equip the Rifle with an adequate fire control system to prevent the injuries to Plaintiffs.

76.     Defendants had actual or constructive knowledge of the problems with Remington Model 600 rifles after the fire control had been replaced under Defendants' recall program, in particular the Rifle's propensity to unexpectedly discharge without pulling the trigger, such that the danger was known or, at a minimum, was reasonably foreseeable, but negligently failed to notify or warn Plaintiffs of the Rifle's dangerous condition.

77.     Defendants owed Plaintiffs the duty of reasonable care when it designed, manufactured, marketed, and sold the Rifle, and when it recalled the Rifle.  Defendants violated their duties and were negligent, as set forth above.

78.     As a result of Defendants negligence, Plaintiff Sharon Barrere has sustained physical, emotional, and psychological injuries, past and future medical expense, past and future lost income, past and future lost earnings capacity, loss of

consortium, loss of established course of life, and other general and special damages in an amount to be determined at trial.

79.     Defendants knew or should have known about the defects alleged in this Complaint and that death and/or catastrophic injuries could occur and have occurred due to defects in the Rifle.  Nonetheless, the defects were not corrected by Defendants, nor did Defendants warn the public about these defects and the risks they posed.

80.     Instead, Defendants deliberately and intentionally concealed such information from Plaintiffs and the public.  Defendants acted with malice in that Defendants had knowledge of facts and intentionally disregarded facts that created a high probability of damage to Plaintiffs and deliberately proceeded to act in conscious and intentional disregard of the high probability of injury to Plaintiffs, and deliberately proceeded to act with indifference to the high probability of injury to Plaintiffs.

81.     Defendants further made representations concerning the safety of the Remington Model 600 rifle after the fire control was replaced under Defendants' recall program with knowledge of its falsity, and concealed material facts concerning the fact that the rifles could fire without a trigger pull causing injury to Plaintiffs.

82.     Plaintiffs are entitled to recover punitive damages from Defendants in an amount to be determined at trial.

## COUNT FOUR
## Loss of Consortium

83.     Plaintiffs hereby incorporate by reference all above allegations as if fully set forth herein.

84.     As a result of the injuries to Plaintiff Sharon Barrere and Defendants negligent and wrongful actions and strict liability as set forth herein, Plaintiff Brice Barrere has been and will in the future be obligated to pay medical and other expenses.

85.     As a result of the injuries to Plaintiff Sharon Barrere and Defendants negligent and wrongful actions and strict liability as set forth herein, Plaintiff Brice Barrere has been and will in the future be deprived of the care, companionship, consortium and society of her husband.

86.     Plaintiff Brice Barrere is entitled to recover damages for loss of consortium and other general and special damages in an amount to be determined at trail herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment, jointly and severally, against the Defendants as follows:

1.      For general and special damages in an amount to be determined at

trial.

2.      For  punitive damages in an amount to be determined at trail.

3.      For  Plaintiffs' costs and expenses.

4.      For such and further relief as the Court deems just and proper.

DATED this 12th day of October, 2012.


Ramler Law Office, P.C.


By: /s/Richard A. Ramler
       Richard A. Ramler
       Attorney for Plaintiffs


**DEMAND FOR JURY TRIAL**

Plaintiffs, by and thought their attorney, hereby demand a trial by jury in the

above-entitled cause.


Ramler Law Office, P.C.

By:/s/Richard A. Ramler
       Richard A. Ramler
       Attorney for Plaintiffs